IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

LILLIAN ALYCE AMBURGEY,

      Plaintiff,

v.                            CASE NO. 2:09-cv-01527

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying the plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.  Contrary to Local Rule 9.4(a), the plaintiff filed a motion for judgment on the pleadings (ECF No. 11).

The plaintiff, Lillian Alyce Amburgey (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on March 20, 2006, alleging disability as of June 25, 2001, due to back sprain, central herniated disc at L4-L5, pain in both legs from herniated disc, neck sprain, severe pain from neck going down into both arms and hands, duodenum ulcers, stress/panic disorder, degenerative

arthritis, fibromyalgia, fibrocystic breast disease, severe acid reflux, bone spurs in my back, restless leg syndrome, migraines, bronchitis, allergies, hiatal hernia, and possibly carpal tunnel in both hands. (Tr. at 16, 70-72, 81-94, 138-143, 144-51.) The claims were denied initially and upon reconsideration. (Tr. at 16, 61-63, 65-67.) On January 17, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 59.) Hearings were held on April 17, 2008 and July 30, 2008 before the Honorable James S. Quinlivan. (Tr. at 30, 40, 937-966, 967-1003.) By decision dated September 18, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 16-28.) The ALJ's decision became the final decision of the Commissioner on October 30, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 7-10.) On December 21, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f),

416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 18.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of smoker's shortness of breath, low back and hip pains (fibroids and chronic lumbo-sacral strain), nearsightedness without correction, tension headaches, major depressive disorder with anxiety and "pain" disorders. (Tr. at 18-20.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 20-22.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 22-27.)  As a result, Claimant cannot return to her past relevant work.  (Tr. at 27.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as light level office helper, production inspector, mail clerk, surveillance systems monitor, fabrication machine tender, and bench worker, which exist in significant numbers in the

4

national economy.  (Tr. at 27-28.)  On this basis, benefits were denied.  (Tr. at 28.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 42 years old at the time of the first

administrative hearing and 43 years old at the time of the second administrative hearing. (Tr. at 943, 971.) She has a tenth grade education and received a General Equivalency Diploma ["GED"]. (Tr. at 943, 964, 971.) In the past, she worked as a bobbin winder machine operator, die cutter machine operator, sewing machine operator, die cutter, and merchandise packer. (Tr. at 944-46, 971-73, 995.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence

Medical records dated February 10, 1998 to July 24, 2001 show that Claimant was treated twelve times at North East Family Practice for a variety of illnesses: vaginal candidiasis, dysuria [painful urination], probable psoriasis/dermatitis, migraine headache, mialgias, fatigue/malaise, leg cramps, menstrual irregularities, anxiety/stress reaction, right wrist/elbow tendonitis, trapezius strain, sinusitis, right eye infection, mildly elevated cholesterol, epigastric pain, low back pain, and influenza. (Tr. at 211-25.)

Medical records dated July 8, 1998 through November 8, 1999 show that Claimant was treated nineteen times at Spring Road Family Practice for prescription refills and a variety of illnesses: allergic rhinitis, sino-bronchitis (smoker), sinusitis, migraine,

6

stress reaction, migraine, flu, lumbar strain, skin lesion, and stomach pain.  (Tr. at 158-71.)

On February 29, 2000, Claimant had a lumbar spine series performed due to low back pain for several days.  (Tr. at 210.) Charles David Scheil, M.D. concluded: "Normal alignment of the lumbar vertebral column is seen.  There are five lumbar type vertebral bodies.  There is minimal disc height loss at the L5-S1 level. SI joints are normal. Impression: Mild lumbar spondylosis, L5-S1 level.  No acute fracture or subluxation."  Id.

On May 26, 2000, Claimant was treated at Catawba Memorial Hospital Emergency Room ["ER"] for abdominal pain.  (Tr. at 182-84.)

On May 29, 2000, Claimant was treated at Catawba Memorial Hospital ER for chest pain.  (Tr. at 179.)  John Parks Booker, M.D. reported that a chest x-ray showed: "The superficial thorax is normal.  The heart, great vessels, and mediastinum are normal.  The pulmonary parenchyma is clear.  Impression: Normal Chest." (Tr. at 180.)

On May 31, 2000, Claimant had an upper gastrointestinal series performed due to epigastric pain.  (Tr. at 209.)  Thomas Russell Whyte, M.D. concluded: "1.   Hiatal hernia...with reflux and nonobstructing schatzki ring with some proximal narrowing noted. 2.  No evidence of peptic ulcer disease is seen."  Id.

On June 16, 2000, Claimant was treated at Catawba Memorial

Hospital ER for eye pain and diagnosed with conjunctivitis by Bert J. Crain, M.D.  (Tr. at 176-78.)

On August 16, 2000, Claimant was treated at Catawba Memorial Hospital ER for dizziness and bilateral ear pain by Gary W. Greer, M.D. who prescribed Percocet for pain and Phenergan for nausea. (Tr. at 172-75.)

On October 30, 2000, Claimant had a right coned compression mammogram at Catawba Memorial Hospital due to a screening mammogram on October 10, 2000.  (Tr. at 206-07.)  Nicholas Frankel, M.D. opined "Probably benign.  Recommend right mammogram in 6 months to assess stability of asymmetric opacity upper outer quadrant right breast, becoming less prominent but not completely effacing with coned compression views today."  Id.

On February 20, 2001, Claimant had an MRI of her lumbar spine at Catawba Memorial Hospital.  William T. Thorwarth, Jr., M.D. reviewed the MRI and opined: "Impression: 1.  Minimal Schmorl's nodes T12 and L2, otherwise negative unenhanced MRI lumbar spine." (Tr. at 186.)

Medical records dated February 12, 2001 through July 9, 2001, show that Claimant was treated at Hart Industrial Clinic for a lumbosacral sprain/strain that occurred on June 18, 2001 and for bilateral wrists tendonitis that occurred on January 25, 2001. (Tr. at 187-202.)  Claimant was returned to work on February 19, 2001 for the tendonitis injury and July 9, 2001 for the

sprain/strain injury. (Tr. at 188-89.)

On February 27, 2001, Claimant had a pelvic ultrasound at Catawba Memorial Hospital.  John Parks Booker, M.D. concluded that Claimant had "1. Uterine fibroid.  2) Possible small ovarian cyst on each side.  These sonolucencies may only represent prominent follicles."  (Tr. at 205.)

On July 31, 2001, Claimant had a mammogram at Catawba Memorial Hospital which was compared to a prior mammogram from October 2000. John Parks Booker, M.D. concluded that the findings were benign and recommended that Claimant have an annual mammogram.  (Tr. at 203.)

Records indicate Claimant was treated at Logan Regional Medical Center Emergency Room ["ER"] multiple times from July 19, 2002 through March 24, 2008. (Tr. at 401-512, 560-619, 717-52, 756-75, 821-48, 875-86.)  Although the handwritten notes are largely illegible, what is legible is summarized in chronological order below.

On July 19, 2002, Claimant had a left hip x-ray at Logan General Hospital.  S. N. Subramaniam, M.D. concluded: "The examination shows no fracture, dislocation, subluxation, lytic or blastic lesions.  There are no soft tissue calcifications noted. Impression: Normal examination."  (Tr. at 512.)

On October 26, 2002, Claimant came to Logan General Hospital ER with complaints of back pain, pelvic pressure, and frequent urination.  (Tr. at 499-511.) A radiology report by Riad Al-Asbahi,

M.D. concluded: "Nonspecific gas pattern.  No bowel obstruction." (Tr. at 499.)

On August 28, 2002, Claimant presented to Guyan Valley Hospital for a medical assessment of her chest pain and cough. (Tr. at 293.)

On December 20, 2002, Claimant presented to Guyan Valley Hospital for a medical assessment of her "pressure in face with headache and pain in teeth." (Tr. at 292.)

On December 20, 2002, Claimant presented to Logan General Hospital ER with complaints of sinus pain and was diagnosed with sinusitis. (Tr. at 493-98.)

On February 28, 2003, Claimant had a lumbar spine x-ray at Logan Regional Medical Hospital. S. N. Subramaniam, M.D. found: "Alignment is within limits of normal. A fracture, dislocation, subluxation is not noted. Minor degenerative changes are noted. Intervertebral disc spaces are fairly well preserved. The vertebral pedicles are unremarkable. Impression: Minimal degenerative changes." (Tr. at 492.)

On March 22, 2003 and March 27, 2003, Claimant presented to the Logan General Hospital ER with complaints of coughing and pain. (Tr. at 466-91.) On March 27, 2003, Rajendra P. Valiveti, M.D. reviewed x-rays of Claimant's chest and concluded: "Both lungs are normally aerated and clear. No pleural effusion noted. Heart and mediastinum are unremarkable. Bony structures are intact.

Impression: Clear lungs.  Normal sized heart."  (Tr. at 477.)

On May 19, 2003, Claimant was evaluated by Nasim Sheikh, M.D. at Family Allergy and Asthma Clinic.  (Tr. at 287-88.)  Dr. Sheikh noted that Claimant smoked two packs per day for the last twenty-two years, had eight cats and two dogs.  (Tr. at 288.)  He stated that Claimant's spirometry was within normal limits and that her limited skin testing revealed "she was positive only to tree with pricks only.   IMPRESSION: 1. Seasonal Allergic Rhinitis, 2. Bronchial Asthma, Acute Sinusitis, 3.   R/O Perennial Allergic Rhinitis." Id. On March 23, 2004, Dr. Sheikh reevaluated Claimant and reported that Claimant was "doing better as far as resp[iratory] symptoms are concerned." (Tr. at 286.)

On May 31, 2003, Claimant presented to the Logan Regional Medical Center ER with complaints of cough, nasal congestion, chest tightness, and back pain.  (Tr. at 452-65.)  She was diagnosed with allergies.  (Tr. at 465.)

On September 26, 2003 and September 27, 2003, Claimant presented to Logan Regional Medical Center ER regarding pain in her hands, arms, and back from a work injury on September 25, 2003. (Tr. at 434-51, 598-605.)  On September 26, 2003, Mahesh Koppikar, M.D. reviewed full series x-rays of Claimant's cervical spine and lumbar spine and concluded: "No significant abnormality." (Tr. at 450-51.)

Records indicate that Claimant was treated at forty office

11

visits by Brian McDevitt, D.O., Varney Medical Center, from
September 30, 2003 through March 24, 2005 for a "cervical strain,
lumbar strain with radiculopathy, herniated nucleus pulposis L4-L5"
due to a Workers' Compensation injury on September 26, 2003. (Tr.
at 331-69, 397-400.)   The initial intake describes Claimant's
injury:

> At approximately 10:00 AM while performing her job duty,
> pt [patient] was removing wood flooring strips from
> wooden belt-line conveyor and placing them into a 7-foot
> cardboard box, which was sitting on rollers about 3.5 ft
> [feet] above ground.  After the box was full the pt was
> working on was filled, at about 10:00 AM, pt attempted to
> slide the full box, weighting bet [between] 50-75 lbs
> [pounds] to the rt [right] side on the rollers, the full
> box slid forward from the rollers toward the pt, who
> caught the full box in her arms.  Pt then ben backwards
> immediately experiencing severe low back pain and the
> sensation of "a knot" in her back.

(Tr. at 345, 366.)

Records indicate Claimant received eight-two physical therapy
sessions at Southern WV Physical Therapy and Sports Medicine form
October 9, 2003 through February 15, 2004.  (Tr. at 226-79.)
Patrick Ellis, MSPT ["Masters of Science in Physical Therapy"]
stated that Claimant's treatment was due to a diagnosis of cervical
and lumbar strain.  (Tr. at 279.)

On November 29, 2003, January 24, 2004, August 3, 2004, August
4, 2004, and August 6, 2004, Claimant came to the  Logan Regional
Medical Center ER with complaints of neck and back pain.  (Tr. at
415-31.)  On November 29, 2003, Mahesh Koppikar, M.D. reviewed an
MRI of the cervical spine and found: "Essentially negative MRI of

12

the cervical spinal area." (Tr. at 433.) On January 24, 2004, Dr. Koppikar reviewed an MRI of the lumbar spine and found: "Central herniation of disc at L4-L5 level minimally." (Tr. at 432.) On August 4, 2004, Dr. Koppikar reviewed radiology reports of Claimant's thoracic spine and lumbar spine and concluded: "No significant abnormality." (Tr. at 422-23.)

Records dated November 25, 2003 through January 10, 2005 indicate Claimant received lumbar epidural injections, lumbar facet joint injections, cervical facet joint injections, trigger point injections, and caudal epidural injections from Francis M. Saldanha, M.D. (Tr. at 310-332.)

On January 9, 2004, Claimant presented to Guyan Valley Hospital for a medical assessment of her harsh cough which was diagnosed as "1. Acute Bronchitis, 2. Smoker." (Tr. at 291.)

On January 24, 2004, Claimant had an MRI of the lumbar spine at Logan Regional Medical Center. (Tr. at 331, 393.) The radiology report was addressed to Brian McDevitt, D.O., Varney Medical Center, but the radiologist is not identified. The report states:

> Lumbar lordosis is well maintained.  There is loss of hydration involving the annulus fibrosus (sic) at L4-L5 level.  Other lumbar intervertebral discs retain normal hydration. Volume of all the lumbar intervertebral discs is well maintained.  Vertebral bodies are moderately homogeneous with minimal fatty changes.  The superior end plate of L2 shows a Schmorl's node.  The prevertebral and paraspinous regions are intact.  CSF flow is well maintained.  Cauda equina, conus medullaris and filum terminale terminate normally.  There is a soft tissue

13

density in the ventral border of the thecal sac at L4-L5
level symmetrically.  No significant lateral components
noted.

IMPRESSION: Central herniation of disc at L4-L5 level
minimally.

<u>Id</u>.

On March 3, 2004, Claimant was evaluated by Robert J. Crow,

M.D., a neurologist.  (Tr. at 280-85.)  Dr. Crow concluded:

NEUROLOGIC EXAMINATION shows the patient to be well
developed, alert and oriented x 3 and in no acute
distress.  The patient is comfortable.  The gait is
normal, with excellent toe and heel walking.  Range of
motion of the low back shows normal flexion and
extension.  There is no midline percussible pain, no
trigger point or spasm.  The patient has 5/5 motor
strength in all the examined myotomes except for 4/5
right EHL weakness.  The patient does have reproduction
of her radicular leg symptoms with straight leg raising
on the right.  Contralateral straight leg raise is
negative.  Sensation is intact to light touch and
pinprick except for a hypalgesia over the right great
toe.  Deep tendon reflexes are intact and symmetric at
the knees and ankles, without pathologic reflexes.
Pulses palpable in both feet...

DIAGNOSTIC STUDIES including cervical MRI from November
2003 is reviewed.  It shows straightening of the normal
cervical lordotic curve but there is no evidence of focal
disc herniation, canal stenosis or abnormal cord signal
present.  The MRI study from January 2004 is reviewed.
There is mild degenerative disc disease primarily at the
level of L4-5 where there is a central to right sided
disc bulge.  There does not appear to be any significant
spinal stenosis, nerve root impingement or foraminal
outlet stenosis.

IMPRESSION: Lumbar spondylosis.  Chronic cervical and
lumbar strain.

RECOMMENDATIONS: Given the patient's history, physical
exam as well as MRI of the spine I do not feel that
surgical intervention will result in significant
reduction in the patient's discomfort.  I would recommend

14

a conservative approach to management here including rest, anti-inflammatory medications and physical therapy. Since she has had these therapies in the past and these haven't resulted in significant reduction of her discomfort it may be appropriate to refer the patient to a multi-disciplinary pain clinic for evaluation and treatment. I see no reason for scheduled neurosurgical follow-up.

(Tr. at 283.)

On April 13, 2004, Claimant presented to Guyan Valley Hospital regarding chronic low back pain. (Tr. at 290.) Although the handwritten notes are largely illegible, the following is legible: "Sts [states] house fire burned up meds." Id.

On August 3, 2004, August 4, 2004, and August 6, 2004, Claimant presented to Logan Regional Medical Center ER for back and neck pain. (Tr. at 586-96.) On August 5, 2004, Mahesh Koppikar stated in a radiology report:

LUMBOSACRAL SPINE:
Normal lordotic curve is maintained. Vertebral bodies and posterior elements are intact. There is no evidence of fracture or destructive lesion. Disc spaces and the sacroiliac joints are normally maintained.

IMPRESSION: No significant abnormality.

THORACIC SPINE:
Normal mild kyphotic curve is noted. Vertebral bodies and visualized posterior elements are intact. Disc spaces are normally maintained. No destructive or degenerative process is identified.

IMPRESSION: No significant abnormality.

(Tr. at 590-91.)

On December 13, 2004, Michael R. Condaras, D.C. evaluated Claimant in relation to her West Virginia Workers' Compensation

15

claim for cervical and lumbosacral strain/sprain. (Tr. at 294-309.) Dr. Condaras opined that Claimant was

> at MMI [maximum medical improvement] and no further treatment will enhance her condition medically. I would however recommend finishing any pain clinic therapy that has been authorized. In addition, the claimant should undergo a FCE and be enrolled in a vocational rehabilitation program because I don't feel she is capable of returning to her former employer. Per your request two separate impairment ratings will be given for the cervical and lumbar spine. With regard to the cervical spine...0%....With regard to the lumbar spine...8% pursuant to Rule 20.

(Tr. at 298.)

Records from BrickStreet Insurance dated January 23, 2004 through July 18, 2005 indicate that Claimant's Workers' Compensation claim of September 26, 2003 was evaluated on July 18, 2005 by Clifford H. Carlson, M.D. and by Rananathan Padmanaban, M.D. on July 7, 2004. (Tr. at 371-96.) Dr. Padmanaban recommended that Claimant

> should undergo pain clinic management as per the advice of Dr. Saldanha...When the injection treatment is finished, she should have a functional capacity evaluation. If that matches her job, she should be able to go back to work. If that doesn't match with her job, then she should have work conditioning and work hardening program before she goes back to work. Then, she should be at maximum medical improvement and at that time she will be ready for an impairment rating. At this time, her injury is not stable. She still needs further treatment.

(Tr. at 391.)

On August 22, 2005, Claimant was treated for left-sided abdominal pain at Logan Regional Medical Center ER. (Tr. at 402-14, 576-85.) Shahram Askari, M.D. reviewed an abdominal

16

radiological report and concluded: "Nonobstructive bowel gas pattern with air fluid level. The possibility of ileus versus early obstruction cannot be excluded. Clinical correlation as well as short term followup examination is recommended." (Tr. at 578.)

On September 9, 2005, Clifford H. Carlson, M.D. reported that he had evaluated Claimant on July 18, 2005 in regard to her Workers' Compensation claim of September 26, 2003. (Tr. at 513-18.) Dr. Carlson opined that the injury

> resulted in chronic lumbosacral spine sprain/strain syndrome and central herniated nucleus pulposus at L4-5. There is chronic right L5 radiculopathy with atrophy of the right calf and dermatomal hypesthesia...There is chronic cervicothoracic spine sprain/strain syndrome with myofascial injury to the right trapezius...The combined values total of 13 and 8 is 20 percent whole person impairment for this injury.

(Tr. at 517-18.)

On March 7, 2006, Joseph E. Fernandes, M.D. examined Claimant in regard to her Workers' Compensation injury of September 26, 2003. (Tr. at 519-33.) Dr. Fernandes disagreed with Dr. Carlson's impairment opinions and made these conclusions:

> Status post lumbosacral sprain and L4-L5 central disc herniation without clinical evidence of lumbar radiculopathy. Status post cervical spine strain with no evidence of cervical radiculopathy...
>
> 1) The claimant has reached maximum medical improvement and will not benefit from additional treatment including physical therapy or pain clinic treatment.
>
> 2) The claimant has not worked since her work related injury on the 26th of September 2003. In my opinion the claimant should be able to take up any light/sedentary type work...

17

I have reviewed the I.M.E. [independent medical examination] report of Dr. Clifford Carlson dated 09/09/05. For the lumbar spine, Dr. Carlson has placed the claimant under Lumbar Category III with permanent impairment of 13%. The claimant does not fall into the lumbar Category III of Rule 20 because she has no signs of lumbar radiculopathy, no dermatomal sensory loss, no loss of lower extremity reflexes, no motor strength loss and there is no evidence of unilateral atrophy of the calf or thigh muscles. The claimant does have a central L4-L5 disc herniation as per the MRI. Since the claimant does not have any evidence of lumbar radiculopathy and has not undergone any lumbar disc surgery, the claimant should be in Lumbar Category II with maximum impairment of 8% as per Rule 20.

With reference to the cervical spine, Dr. Carlson has placed the claimant under Cervical Category II B which is incorrect because the claimant does not have any herniated disc nor [has] the injury caused any degenerative changes in the cervical spine. As stated earlier, the claimant does not fit into [any] of the four Categories of Table 75 and there should not be any impairment.

(Tr. at 526-28.)

Medical records indicate that Claimant was treated at Logan Regional Medical Center on seven monthly occasions from May 19, 2006 through November 30, 2006 by Sathishchandra M. Rao, M.D. (Tr. at 654-79, 717-52.) Outpatient progress notes indicate Claimant was treated for various medical concerns, medication management, and provided referrals to Dr. Diaz, a psychiatrist, and Dr. Ramesh, a pain specialist. (Tr. at 654, 721.)

On June 19, 2006, Claimant presented to Logan Regional Medical Center with complaints of abdominal pain. (Tr. at 565-75.)

On June 19, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that

Claimant could perform light work with the exertional ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour day, and to have unlimited push and/or pull abilities. (Tr. at 537.)  Claimant was found to be capable of occasionally performing all postural activities with the exception of climbing ladders/rope/scaffold.  (Tr. at 538.) Claimant was determined to have no manipulative, visual, or communicative limitations. (Tr. at 539-40.)  She was found to have no environmental limitations save to avoid concentrated exposure to extreme temperatures and hazards.  (Tr. at 540.)  The evaluator, Porfirio Pascasio, M.D. noted that he agreed with Dr. Fernandes' opinion that claimant should be able to take up any light/sedentary type work and Dr. Saldanha's opinion that she was capable of returning to her prior occupation as a packer.  (Tr. at 542.)  Dr. Pascasio found Claimant's primary diagnosis to be "back pain syndrome/OA [osteoarthritis] /GERD [Gastroesophageal Reflux Disorder]" and the secondary diagnosis to be "fibromyalgia." (Tr. at 536.)  He further opined:  "Some [of Claimant's] allegations are not supported by medical evidence therefore she is only partially credible." (Tr. at 541.)

On July 12, 2006, Dr. Rao reported a "West Virginia Department of Health and Human Resources General Physical" examination of Claimant.  (Tr. at 558-59.)  The form has illegible handwritten

19

notations.

On July 19, 2006, Claimant presented to Logan Regional Medical Center ER with complaints of migraine headache and nausea.  (Tr. at 560-64.)

On August 17, 2006, Ziad Salem, M.D., Logan Regional Medical Center, evaluated Claimant regarding her complaints of "epigastric and chest pain associated with nausea but no vomiting."  (Tr. at 614.)  He stated that he would schedule her for an upper endoscopy. (Tr. at 615, 785.)

On August 21, 2006, Dr. Salem concluded in an endoscope report: "Impression:  1.  Small hiatal hernia.  [553.3].   2. Nonerosive gastritis of the antrum.  [535.40].   Two biopsies were obtained from the antrum.  3.  The duodenum appeared normal."  (Tr. at 606.)  On that same date, the pathology results were reported: "Final Diagnosis: 1) Biopsy duodenum: Mild increase of mononuclear cells in lamina propria.   No active inflammation.   No villous atrophy.   2)  Biopsy  Antrum:  Coronic  gastritis.   No  active inflammation.  Modified Giemsa Stain Negative for H. Pylori."  (Tr. at 607, 778.)

On August 30, 2006, Claimant presented to Logan Regional Medical Center ER with complaints of chest pain wherein she was admitted and then discharged the following day.  (Tr. at 756-775.) Radhakrishna U. Kukkillaya, M.D. diagnosed Claimant with "1. Unstable angina.  2. Hypertension.  3. Hyperlipidemia...The patient

just had a Cardiolite prior to the admission and since she had chest pain she came to the emergency room. Cardiolite was positive for defect so she was transferred to Dr. Basu's service for a heart catheterization." (Tr. at 756.) The Persantine Cardiolite test results reported by Mamida M. Satyanara, M.D. were:

> Conclusion:
> 1. Patient tolerated IV Persantine with symptoms of chest pressure.
> 2. EKG showed no reversible ischemic changes.
> 3. Cardiolite spect images showed anteroseptal reversible defect in a small area consistent with ischemia.
> 4.  Global LV systolic function appeared preserved.
>
> Recommendations:
> In view of her chest symptoms and positive Cardiolite test, suspect she has significant LAD disease and cardiac catheterization may be considered.

(Tr. at 676-78, 731-33, 772-74.

On August 31, 2006, Claimant was admitted to Charleston Area Medical Center ["CAMC"] from Logan General Hospital due to "shortness of breath after inhaling Clorox and she underwent several tests including a nuclear stress test which was reported to be abnormal, hence she was sent here (CAMC) for cardiac catheterization...She has been smoking 2 packs a day for the last 23 years." (Tr. at 643.)  On September 1, 2006, Claimant underwent a left heart catheterization and left ventriculography at CAMC.  (Tr. at 630-52.) The surgeon, Srinivasan Narasimban, M.D. noted:

> The left main coronary artery is normal...
>
> Left ventriculography shows good left ventricular

systolic function with an ejection fraction of 60%.  No
segmental wall motion abnormalities see.

Discussion  and  Recommendations:   Current  cardiac
catheterization   shows   minor   noncritical   wall
irregularities in the right coronary artery.  In view of
this, the patient is recommended medical therapy and risk
factor modification, especially cessation of smoking.

(Tr. at 630.)

On September 8, 2006, Dr. Rao reviewed radiographic reports of
Claimant's lumbar and cervical spines.  The lumbar spine
interpretation concluded: "The pedicles are intact.  Disc spaces
appear unremarkable.  Impression: Transitional vertebrae.  No
significant degenerative changes noted." (Tr. at 674, 729, 776.)
The cervical spine interpretation concluded: "No fracture noted.
The pedicles are intact.  Disc spaces, intervertebral foramina
appear unremarkable.  Impression: No significant degenerative
changes noted."  (Tr. at 675, 730, 777.)

On November 3, 2006, H. S. Ramesh, M.D. evaluated Claimant for
"Persistent neck pain radiating to upper extremities...tingling and
numbness in upper extremities."  (Tr. at 681.)  Dr. Ramesh
diagnosed: "1.  Bilateral moderate degree Carpal Tunnel Syndrome
#354.0.  2.  Lumbago #724.2.  3.  Fibromyalgia #729.1.  4.
Cervical Spondylosis #721.0."  (Tr. at 680, 685.)  He recommended
that Claimant receive hand therapy three times a week for 4 weeks.
(Tr. at 680.)

On December 8, 2006, a State agency medical source completed
a Physical Residual Functional Capacity Assessment and opined that

22

Claimant could perform light work with the exertional ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour day, and to have unlimited push and/or pull abilities. (Tr. at 690.) Claimant was found to be capable of occasionally performing all postural activities with the exception of climbing ladders/rope/scaffold. (Tr. at 691.) Claimant was determined to have no manipulative, visual, or communicative limitations. (Tr. at 692-93.) She was found to have no environmental limitations save to avoid vibration and hazards. Dr. Gomez found Claimant's primary diagnosis to be "back pain syndrome/OA [osteoarthritis] /GERD [Gastroesophageal Reflux Disorder]" and the secondary diagnosis to be "fibromyalgia." (Tr. at 693.) The evaluator, A. Rafael Gomez, M.D. noted:

> Patient was reviewed on 06/19/06 and reduced to light work. She was partially credible. New medical evidence says that patient alleges hernia and ulcers and her problems have worsened. She has severe stomach pain and constant headaches. However the physical exam is normal except for soreness of the lumbar spine and the neurological findings are reported as normal. There is no change in the RFC.

(Tr. at 694.)

On January 8, 2007, Claimant went to the Logan Regional Medical Center ER with complaints of a nonproductive cough with chest pain radiating into back. (Tr. at 839-48.)

On March 19, 2007, Dr. Rao reported a check up of Claimant at Logan Regional Medical Center:

This is a 41 year old female known to me for the last one year, treated for chronic low back pain, lumbosacral strain, cervical spondylosis, fibromyalgia, chronic anxiety depression, carpal tunnel both hands more on the right side.  Her pain and burning in the right arm is getting worse.  She does not want to go through an EMG because she has financial problems.  Also she is hurting all over with fibromyalgia.  She wants to know whether she has rheumatoid arthritis, I told her that I can do blood test and send her to a rheumatologist.  At the present time the patient want to be treated medically. The patient is still all over.  Also treated for chronic bronchitis.  She is smoking one to two packs per day. Her pain level 1 to 10 is 9, she is not getting any better.  Also, she is unable to pay for her Nalfon...

Recommendations: Continue on 2 gram sodium, low cholesterol diet.  Need to quit smoking.  I stopped the Nalfon and wrote her for Naproxen 500 mg twice daily with five refills, Lortab increasing to 10 mg twice daily sixty (#60) and two refills, continue Flexeril 10 mg twice daily, baby aspirin 81 mg daily, continue Xanax 1 mg twice daily, Lexapro 10 mg daily. I will see her every few hours [sic] for a check up.

(Tr. at 754.)

On March 28, 2007, Claimant presented to Logan Regional Medical Center ER with a right upper thigh wound due to "stuck wire in leg or possible spider bite." (Tr. at 832.) An x-ray of the right femur showed no foreign body, fracture or dislocation. (Tr. at 836.)

On June 21, 2007, Dr. Rao stated in a progress note:

This is a 41 year old female known to me for the last one year. She was treated for chronic low back pain, lumbar radiculitis, fibromyalgia, chronic anxiety and depression. She is still smoking and continues to have low back pain...getting more nervous and anxious...mildly depressed. The medication we are giving is definitely helping her...I will see her every three months.

(Tr. at 854.)

On July 17, 2007, Claimant presented to Cabell Huntington Hospital ER with facial bilateral numbness. (Tr. at 786-90.) She was diagnosed with "TMJ [temporomandibular joint] malocclusion" and discharged. (Tr. at 788.)

On August 12, 2007, Claimant presented to Cabell Huntington Hospital with dental pain. (Tr. at 791.) She was diagnosed with a dental abscess and discharged. (Tr. at 792-820.)

On November 19, 2007, Claimant presented to Logan Regional Medical Center with complaints of right sided abdominal pain. (Tr. at 821-25.) David Keadle, M.D. stated that a CT of the abdomen revealed: "There are bilateral renal stones. These measure up to approximately 3 mm in maximum dimension. There is no hydronephrosis. The remainder of the upper abdomen appears grossly unremarkable given limitations of a noncontrast study." (Tr. at 826.) He stated that a CT of pelvis showed: "There are phleboliths in the pelvis. No distal ureteral stones are identified and there is no hydroureter. The appendix is visualized and appears normal." (Tr. at 826-27.)

On January 16, 2008, Dr. Rao reported in a progress note:

This is a 42 year old female known to me in the past. The patient is a private pay with multiple medical problems. She was sent by Medicaid for a complete examination to get a Medicaid card so she can be sent to a number of specialists for her many medical problems. The patient is a heavy smoker although I have told her a number of times to quit smoking using different options like Nicoderm patch, Wellbutrin XL and Chantix, she never filled any of the prescriptions. Treated for panic attacks, chronic depression, bipolar depression for which

25

> she goes to Dr. Diaz, gets Celexa, Xanax and Trazadone.
> She comes to me with a history of hypertension,
> hyperlipidemia, chronic low back pain, lumbar
> radiculitis, fibromyalgia. Lately she is getting
> fatigued, tired...Still has flank pain from kidney stone
> on and off. Also she has heavy menstrual periods. She
> has not seen any gynecologist recently...she needs a
> colonoscopy and upper endoscopy. She states she is under
> a lot of stress.

(Tr. at 852.)

On March 24, 2008, Claimant presented to Logan Regional Medical Center ER with complaints of chest and abdominal pain. (Tr. at 875-86.) She was diagnosed with "kidney stone" and a chest x-ray showed "No acute cardiopulmonary process." (Tr. at 884.)

On April 15, 2008, Claimant was evaluated by David Afram, M.D. regarding excessive menstrual flow and pelvic pain. (Tr. at 914-34.)

On April 21, 2008, Claimant had an endoscopy and colonoscopy at Logan Regional Medical Center. (Tr. at 888-90.) Ziad Salem, M.D. reported: "Angioectasia/AVM in the traverse colon...[and] the descending colon. Argon beam coagulation was applied to control bleeding. Internal hemorrhoids." (Tr. at 889.)

On April 22, 2008, Dr. Afram reported: "The patient had a sonogram showing multiple fibroids in the wall of the uterus which could be related to the patient's pain but not to the excessive bleeding. The patient will have hystoscopy in 3 days and should the biopsies be negative the patient will have the option then of definitive management with hysterectomy for the pain and

menorrhalgia versus conservative management." (Tr. at 926.)

On May 31, 2008, Claimant presented to Logan Regional Medical Center ER with complaints of right flank pain. (Tr. at 894-901.) A noncontrast CT of the pelvis was reviewed by Candace Howard-Claudio, M.D. and compared with a prior study of November 19, 2007. (Tr. at 894-95.) Dr. Howard-Claudio diagnosed: "1. No evidence of acute pelvic process. 2. Persistent enlarged myomatous uterus...Stable nonobstructive right sided nephrolithiasis [kidney stones]." Id.

On June 25, 2008, Claimant presented to the Logan Regional Medical Center ER with complaints of abdominal pain. (Tr. at 905-12.) Donald Lewis, M.D. stated in a abdomen and chest diagnostic imagining report: "Heart and lungs are normal...Nondiagnostic bowel gas pattern. No evidence of acute process." (Tr. at 906.)

On July 7, 2008, Dr. Afram reported:

I originally recommended hysterectomy to treat the menometrorrhagia and the fibroid uterus, however the patient's carrier, who is Medicaid, at the time, refused to approve the hysterectomy and demanded medical management initially. Patient had medical management with NovaSure ablation of the endometrium to treat the menometrorrhagia, which was significant distress for the patient. The NovaSure ablation was done on 4-30-08 with great success. Patient has not had any vaginal bleeding since and indicate great solution of the menometrorrhagia has occurred. However, the patient's pain continued to persist and became even more severe due to the fibroid uterus and the patient has been worked up in the ER and in Huntington hospital recently due to pain episode due to the fibroid uterus and the repeat CT scan showed slightly enlarged fibroid. Patient presented today again and the plan is to try to proceed ahead with hysterectomy with conservation of the ovaries due to the fibroid

27

uterus...Hopefully this surgery will be approved, we will proceed with a hysterectomy to treat the patient's fibroid uterus[1].

(Tr. at 933.)

Psychiatric Evidence

On June 9, 2006, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 544-57.) The evaluator, Karl G. Hursey, Ph.D., clinical psychologist, found that Claimant had no medically determinable impairment. (Tr. at 544.) Dr. Hursey concluded: "Based on the MER [medical evidence of record] the Clmt's [Claimant's] statements are partially credible. Anxiety tx [treatment] by Xanax by PCP [primary care physician]. No psych [psychiatric] tx [treatment]. No hospitalizations." (Tr. at 556.)

On August 28, 2006, Angel Glick, M.A., licensed psychologist, Psychological Associates of Logan, Inc., evaluated Claimant and provided a psychological assessment report for Claimant's representative. (Tr. at 620-29.) Ms. Glick stated:

**Mental Status Examination:**

The client was dressed in casual clothing and was adequately groomed. Dress was appropriate for the situation. Posture was normal. Gait was normal. Rapport was easily established. Interpersonal behavior was friendly and cooperative. The client interacted appropriately with the psychologist. Eye contact was good. Responses were made with appropriate elaboration. The client was able to spontaneously generate a conversation. She did not have a sense of humor. Her

_____

[1] Per the supplemental hearing transcript of July 30, 2008, Claimant had a hysterectomy in mid-July, 2008. (Tr. at 978, 988.)

28

overall social pattern was normal.  Speech was delivered in normal tones, at an average pace.  She spoke in a clear and concise manner.

The client was oriented to time, place, person, and situation.  Observed mood was anxious.  Affect was moderately restricted.  Ideation revealed stream of thought to be organized, relevant, and logically connected.  Emotional reactions were relevant to thought content and situation.  Active psychotic thought patterns were not evident.  Hallucinations were reported with the last occurring two days ago.  No delusions were indicated.  No obsessive-compulsive thoughts and/or behaviors were admitted.  The client denied any phobias.  Active suicidal or homicidal ideations were denied.  The client had some insight into the nature of her problems and emotions.  Judgment was average based on the client's response to a question of social expectation.

The client's immediate memory was within normal limits based on recall of four of four words.  Her recent memory was moderately deficient based on her recall of two of four words after thirty minutes.  The client's remote memory was unimpaired as measured by her ability to report her social history social information.  Concentration was mildly deficient as measured by her performance of Serial 3's backward from 20 with one error.  The client's psychomotor activity was marked by fidgeting.  Involuntary movements were not noted.

It may be noted that due to the client's education history, evaluation of her intellectual functioning and academic level was deemed unnecessary.  Given her current deteriorated state of mental health, it was my opinion that an extensive testing, such as the MMPI-2, would only serve to exacerbate her condition.  Thus, based on the clinical interview, a screening of depression and anxiety appeared to be the appropriate assessment(s) to assist in diagnosing this client.  Therefore, the BDI-II and BAI were administered.  Results are described below.

**Beck Depression Inventory - Second Edition (BDI-II)**
The BDI-II is a self-report inventory that measures the severity of depressive symptoms for the past two weeks.  The client's responses indicated severe levels of depression.

**Beck Anxiety Inventory (BAI)**

The BAI is a self-report inventory that measures the severity of anxiety-related symptoms for the past week. The client's responses indicated severe levels of anxiety.

**Diagnosis:**

| | | |
|---|---|---|
| Axis I: | 296.34 | Major Depressive Disorder, Recurrent, Severe with Psychotic Features |
| | 300.21 | Panic Disorder with Agoraphobia |
| Axis II: | V71.09 | No Diagnosis |
| Axis III/IV: | | back pain, leg pain, duodenum ulcers, arthritis, fibromyalgia, fibrocystic breast disease, acid reflux, restless leg syndrome, migraine headaches, bronchitis, allergies, hiatal hernia, bilateral carpal tunnel syndrome per client report and correspondence |
| Axis V: | | GAF 45-50... |

In accordance with this evaluation, the client's functioning in all domains appeared deteriorated as a result of her psychological condition. Psychotropic intervention (under the direction of a psychiatrist) and outpatient therapy are advised. If the client follows suggested mental health treatment, her psychological condition should stabilize and possible (sic) allow a return to some type of employment. Conversely, she did report some medical problems that may prevent her from doing so. The latter, of course, would have to be determined by the appropriate medical professional. As a final point, to the extent that medical problems persist, psychological problems will likely persevere of some level as well. This could result in mental health intervention of longer duration to assist the client with that lifestyle adjustment and to reach an acceptable level of daily functioning.

(Tr. at 623-24.)

On August 28, 2006, Ms. Glick also completed a form titled: Medical Assessment of (Mental) Ability to do Work-Related Activities. (Tr. at 626-29.) Ms. Glick marked that Claimant had a "fair" ability to: follow work rules; relate to co-workers; use

judgment; interact with supervisor(s); understand, remember, and carry out simple job instructions; and maintain personal appearance. (Tr. at 627-28.) She marked that Claimant had a "poor" ability to: deal with public; deal with work stresses; function independently; maintain attention/concentration; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. Id. She concluded that Claimant can manage benefits in her own best interest. (Tr. at 629.)

Illegible progress notes dated November 10, 2006, November 30, 2006, May 9, 2007, September 6, 2007, and January 3, 2008, indicate that Claimant was treated by Antonio Diaz, M.D., a psychiatrist. (Tr. at 686-88, 849-51, 858-60.)

On December 11, 2006, a State agency medical source completed a Mental Status Examination of Claimant. (Tr. at 697-702.) The evaluator, Lester Sargent, M.A., licensed psychologist, noted that Claimant "cited fibromyalgia to be the primary reason she is unable to work...has been taking Xanax and Celexa since 1999. She reported an incident in which her 11-year old daughter was kidnaped in 1999...for three days as a precursor to the depression and anxiety attacks." (Tr. at 698.) He concluded:

MENTAL STATUS EXAMINATION: The following observations were made during the evaluation:

<u>Appearance</u>: The claimant appeared for the interview casually dressed and with proper hygiene. She was well-groomed and appeared her stated age of 41 years. <u>Attitude/Behavior</u>: The claimant was cooperative during the evaluation. Eye contact was good. <u>Speech</u>: Speech was coherent and connected. <u>Orientation</u>: She was oriented to time, place, person, and date. <u>Mood</u>: Observed mood was remarkable for mild anxiety and mild depression. <u>Affect</u>: Affect was mildly restricted. <u>Thought Processes</u>: Thought processes were understandable and connected. <u>Thought Content</u>: There was no evidence of delusions, paranoia, obsessive thoughts, or compulsive behaviors. <u>Perceptual</u>: There was no evidence of unusual perceptual experiences. <u>Judgment</u>: Judgment was mildly deficient, based on responses to Comprehensive subtest questions. <u>Insight</u>: Insight was fair, based on responses to questions regarding social awareness. <u>Psychomotor Behavior</u>: There was no evidence of psychomotor agitation or retardation, other than mild restlessness. <u>Suicidal/ Homicidal Ideation</u>: The claimant denied suicidal and homicidal ideation. <u>Immediate Memory</u>...within normal limits, based on her ability to instantly recall four of four words. <u>Recent Memory</u>...Moderately deficient, based on her ability to identify two of four words after a 30-minute delay. <u>Remote Memory</u>...normal, based on her ability to recall details of her personal history. <u>Concentration</u>...within normal limits based on Digit Span subtest scaled score of 8. <u>Persistence</u>...normal, based on her ability to remain on task. <u>Pace</u>...normal, as evidenced during the evaluation.

<u>SOCIAL FUNCTIONING</u>: During the Evaluation...within normal limits, based on clinical observations of social interaction with the examiner and others (i.e. eye contact, sense of humor, and mannerisms).

<u>DIAGNOSES</u>: Based on review of available records and impressions made during the evaluation, the following diagnoses are appropriate.

| | | |
|---|---|---|
| Axis I | 307.89 | Pain Disorder Associated with Both Psychological Factors and a General Medical Condition |
| | 300.02 | Generalized Anxiety Disorder |
| | 300.01.1 | Panic Disorder, Without Agoraphobia |
| Axis II | V71.09 | No diagnosis |
| Axis III | | Fibromyalgia, neck pain, lower back pain, bilateral carpal tunnel |

syndrome, fibrocystic breast
disease, duodenum ulcers, and acid
reflux (Per claimant and records
review)...

SOCIAL FUNCTIONING: Self-Reported: The claimant relies
upon her daughter to go to the store or runs errands.
She talks on the phone with family members.  She does not
exercise.  Her hobby is listening to a police scanner.
She keeps medical appointments.  She does not attend
church or other social functions.  She reported no close
friends...

DAILY ACTIVITIES: The claimant arises around 12:00 p.m.
She is able to perform all basic living duties without
assistance.  She helps with household chores, to include
cooking, laundry, and dishes, noting that her daughter
performs most of the housework.  Her daily routine begins
by drinking a cup of coffee, smoking a cigarette, and
watching TV.  She helps with household chores, working
ten to fifteen minutes at a time, before having to take
a break due to pain....At night, she listens to the
police scanner, watches TV, and goes to bed around 2 a.m.

PROGNOSIS: Fair.
CAPABILITY: The claimant appears capable of managing her
funds, should an award be made.

(Tr. at 699-701.)

On December 28, 2006, a State agency medical source completed

a Psychiatric Review Technique form.  (Tr. at 703-16.)  The

evaluator, James Binder, M.D., psychiatrist, found that Claimant's

impairment was not severe.  (Tr. at 703.)  Dr. Binder found that

Claimant had a mild degree of limitation in restriction of

activities of daily living, difficulties in maintaining social

functioning, concentration, persistence, or pace, and no episodes

of decompensation, each of extended duration.  (Tr. at 713.) He

found that the evidence did not establish the presence of the "C"

33

criteria.  (Tr. at 714.)  Dr. Binder concluded that Claimant had
"nonsevere functional limitations from mental condition; severity
of reported difficulties is not fully supported by MER [medical
evidence of record]."  (Tr. at 715.)

A one-page form titled "West Virginia Department of Health and
Human Resources 2-25-08 Psychologist's Summary" is attributed to
Dr. Diaz in a handwritten note at the bottom of the form.  (Tr. at
857.)  Although largely illegible, what is legible of the diagnosis
section appears to state: "Generalized Anxiety Disorder...Panic
Disorder."  Id.

On May 12, 2008, a State agency medical source completed an
Adult Mental Profile examination of Claimant.  (Tr. at 861-69.) The
evaluator, Lester Sargent, M.A., licensed psychologist, made
essentially the same findings as in his report of December 11, 2006
with the exception of adding "Major Depressive Disorder, Single
Episode, Moderate" to the diagnoses list.  (Tr. at 864.) Also, he
found Claimant's social functioning was "mildly deficient" and
noted that her daily activities now included: "She sometimes goes
back and forth to the trailer next door to visit her daughter and
play with her grandchildren and then returns home, talks with her
husband, watches TV, and then may visit with her grandchildren
again...watches TV and goes to bed around 11:00 p.m." (Tr. at 864-
65.)

Mr. Sargent also completed a form titled "Medical Source

Statement of Ability to do Work-related activities (Mental)." (Tr. at 867-69.)   He marked "Yes" to the question: "Is ability to understand, remember, and carry out instructions affected by the impairment?"   (Tr. at 867.)   He marked "None" regarding "the individual's restriction for the following work-related mental activities: Understand and remember simple instructions; Carry out simple instructions; The ability to make judgments on simple work-related decisions;" and marked "Moderate" regarding her restriction to perform these activities: "Understand and remember complex instructions; Carry out complex instructions; The ability to make judgments on complex work-related decisions."   <u>Id</u>.   He also indicated that Claimant's ability "to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting," was moderately affected by impairments.   (Tr. at 868.)

On March 12, 2008, Angel Glick, M.A., licensed psychologist, Psychological Associates of Logan, Inc., evaluated Claimant and provided a psychological assessment report for the West Virginia Department of Health and Human Resources ["DHHR"] as supportive evidence by DHHR in making a determination of Claimant's Medicaid eligibility.   (Tr. at 870-74.)   Ms. Glick stated:

> **Diagnosis:**
> Axis I:  296.52     Bipolar  I Disorder, Most Recent
>                     Episode Depressed, Moderate
>                     Severe without Psychotic Features
>          300.21     Panic Disorder with Agoraphobia
> Axis II: V71.09     No Diagnosis...

Axis V:   GAF        45-50

**Summary and Conclusions:**

The client reported and/or exhibited depressed mood, disturbed sleeping and eating patterns, less energy, less interest in activities, memory deficiencies, and impaired concentration. She also indicated episodes of mania with elevated mood, hyperactivity, increased talkativeness, insomnia, and impulsiveness. These symptoms appear to be recurrent and are presently exacerbated by medical/physical problems. For these reasons, she was diagnosed with Bipolar Disorder, Most Recent Episode Depressed, Moderate on Axis I. In addition, the client reported discrete periods of discomfort during which she experiences an increased heart rate, increased anxiety, shakiness, difficulty breathing, dizziness, and fear of dying. As she indicated discomfort in crowds, Panic Disorder with Agoraphobia was diagnosed on Axis I as well.

In accord with this evaluation, the client's daily functioning does appear to be deteriorated as a result of her psychological condition. Psychotropic intervention (under the direction of a psychiatrist) and outpatient psychotherapy are advised. From a mental health standpoint, it is my opinion that the client would not be able to adequately function in a vocational environment at this time. Regarding further employment, the prognosis is fair. Her psychological status should not be considered a permanent disability. If she completes /follows recommended mental health treatment, her emotional condition should stabilize. This, in turn, would likely enhance her daily functional capacity in all domains and possibly allow her return to some type of occupation...to the extent that medical/physical problems persist, some psychological difficulty will likely persevere as well. This may result in mental health intervention of longer duration to help the client adjust to this lifestyle and reach an acceptable level of daily functioning.

(Tr. at 873-74.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not

36

supported by substantial evidence because (1) the ALJ failed to properly assess Claimant's credibility; (2) the ALJ failed to consider and grade the level of severity of the Claimant's Fibromyalgia; and (3) the ALJ failed to appropriately evaluate the vocational expert's opinions and arbitrarily dismissed conclusions reached by the vocational expert during examination by Claimant's representative. (Pl.'s Br. at 8-12.)

The Commissioner asserts that (1) substantial evidence supports the ALJ's credibility finding and his determination that Claimant could perform a range of light exertional work during the relevant period; (2) the ALJ properly evaluated the evidence concerning Claimant's diagnosis of Fibromyalgia; (3) the ALJ met his burden at Step Five to produce evidence of work that Claimant could have performed during the relevant period despite her impairments. (Def.'s Br. at 10-19.)

<u>Credibility Determination</u>

Claimant first argues that the ALJ erred when he failed to find Claimant fully credible. (Pl.'s Br. at 8-9.)  Specifically, Claimant asserts:

> Stated simply, it appears rather obvious at least to the undersigned that the deciding factor in this claim related to credibility.  It started from the ALJ labeling the Plaintiff's breathing problems as "smokers" and continued all throughout the decision wherein he pointed out what were deemed as significant discrepancies of testimony.
>
> The undersigned would respectfully submit that the Plaintiff's testimony both at the hearing as well as

37

statements made to various providers through the life of this claim have not been unreasonably inconsistent. After all, we all go through periods wherein our habits and routine will sometimes change, both increasing and/or decreasing...

The ALJ also for some reason found significant the fact that the Plaintiff's husband was also found to be disabled the same date the Plaintiff indicates she last actually worked. With all due respect, the undersigned does not see how that is relevant. However, it has at least at some level affected the ALJ's consideration or otherwise there would have been no mention of it.

(Pl.'s Br. at 8-9.)

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant's subjective statements concerning the limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC finding. (Def.'s Br. at 13-18.) The Commissioner cited three specific inconsistencies discussed by the ALJ which led him to conclude that portions of Claimant's testimony was not credible. (Def.'s Br. at 14.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529, requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that

factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record.  This includes, but is not limited to:

> - The medical signs and laboratory findings;

> - Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

> - Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

The ALJ wrote a very thorough 13-page decision, which included a full analysis of Claimant's impairments and the medical evidence of record, including Claimant's daily activities. (Tr. at 16-28.) The ALJ made these specific findings regarding Claimant's credibility:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent

they are inconsistent with the residual functional capacity assessment for the reasons explained below.

In terms of the claimant's alleged impairment, a Workers' Compensation physician noted that the claimant had reported an injury while at work on September 26, 2003 when a box holding wood fell on top of her (Exhibit 15F). I find it interesting that the claimant's husband also was found disabled on September 26, 2003 and is currently receiving Social Security benefits (Exhibit 8F, p3). At the first hearing, the claimant testified she could sit for only 10 minutes at a time. But, at the supplemental hearing, she testified she can sit for 20 minutes at a time. The claimant reported to a psychological evaluator on August 28, 2006 that [she] does "pretty much nothing. Walk out in the yard and back in the house." Exhibit 25F, p3). But in December 2006, she reported that she helps with the household chores, such as cooking, laundry and dishes noting that her daughter performs most of the household chores (Exhibit 31F). She watches television (Exhibits 25F, 31F, 42F, 43F). But she reported to the same examiner in March 2008 that her daughter takes care of all the household chores, including preparing meals, household chores, and grocery shopping (Exhibit 43F). Further, in May 2008 the claimant reported that her daughter performs "most of the housework" suggesting she may perform some of them (Exhibit 42F). Psychological examination in August 2006 indicated the claimant has no contact with family members outside her home or with friends (Exhibit 25F). Yet, the psychological examiner in December 2006 observed the claimant was functioning within the normal range socially and the claimant also reported she talks with family members on the phone and keeps medical appointments (Exhibit 31F). In March 2008, the claimant reported decreased social interaction due to anxiety (Exhibit 43F). But, she also reported to the psychological consultative examiner that she goes back and forth between her trailer and her daughter's home next door to play with or just visit with her grandchildren, and she talks with her husband and visits with her daughter (Exhibit 42F). I find, therefore, that the credibility of the claimant's testimony is only poor-to-fair, at best.

(Tr. at 25-27.)

In his decision, the ALJ determined that Claimant had

medically determinable impairments that could cause her alleged
symptoms. (Tr. at 25.) The ALJ's decision contains a thorough
consideration of Claimant's daily activities, the location,
duration, frequency, and intensity of Claimant's pain and other
symptoms, precipitating and aggravating factors, Claimant's
medications, and treatment other than medication. (Tr. at 18-28.)
The ALJ explained his reasons for finding Claimant not entirely
credible, including the objective findings, Claimant's treatment,
the lack of evidence of side effects which would impact Claimant's
ability to perform light work with exertional limitations, and her
self-reported daily activities. (Tr. at 23-28.)

     With respect to Claimant's argument that the ALJ wrongfully
discredited Claimant's credibility, the court finds that the ALJ
properly weighed Claimant's subjective complaints of pain and her
credibility in keeping with the applicable regulations, case law,
and social security ruling ("SSR") and that his findings are
supported by substantial evidence.  20 C.F.R. § 404.1529(b)(2006);
SSR 96-7p, 1996 WL 374186 (July 2, 1996); <u>Craig v. Chater</u>, 76 F.3d
585, 594 (4th Cir. 1996).

<u>Fibromyalgia - Determining Severity of Impairment</u>

     Claimant asserts that the ALJ failed to consider and otherwise
grade the level of severity of Claimant's fibromyalgia condition.
Claimant's argument in full on this point is as follows:

          As pointed out in the Plaintiff's request for Appeals
     Council Review, the ALJ simply did not give any

significant attention to the Plaintiff's Fibromyalgia
condition, despite the fact that Plaintiff discussed the
same during the hearings and despite the aforementioned
records confirming the diagnosis.

Perhaps it was simply oversight which has led to its
omission, but in any case clearly it is a significant
condition affecting the claimant's employability that
must be given its due consideration either as a severe or
not severe impairment.

(Pl.'s Br. at 10.)

The Commissioner responds that the ALJ properly evaluated the

evidence concerning Claimant's diagnosis of fibromyalgia. (Def.'s

Br. at 10-12.)  Specifically, the Commissioner asserts:

Contrary to Plaintiff's contention otherwise, the ALJ
adequately addressed Plaintiff's fibromyalgia diagnosis.
The ALJ discussed Plaintiff's testimony that she had
fibromyalgia, and recognized that Dr. Ramesh diagnosed
fibromyalgia during the relevant period (Tr. 24).  In
addition to considering Dr. Ramesh's report, the ALJ
considered and relied, in part, on the opinion evidence
from the two state agency experts who also diagnosed
fibromyalgia, but ultimately concluded that Plaintiff
could still perform some light work.  The critical
inquiry is whether a condition causes functional
limitations of disabling severity.  In this case,
Plaintiff has failed to meet her burden to provide
evidence that fibromyalgia, or any other impairment,
rendered her totally disabled.  Moreover, the ALJ's
comprehensive RFC finding, more than accommodates any
limitations arising from any fibromyalgia symptoms.

Plaintiff further objects to the ALJ's decision because
he did not indicate whether fibromyalgia was a severe
impairment or a non-severe impairment.  Even if this
Court were to determine the ALJ should have deemed
Plaintiff's fibromyalgia severe, the ALJ's decision does
not lack the support of substantial evidence.  Because
the ALJ found that Plaintiff had several other severe
impairments at step two, his analysis proceeded to step
three of the sequential evaluation process...As such,
where the Commissioner finds that the claimant suffers
from even one severe impairment, any failure on the

42

Commissioner's part to identify other conditions as being severe does not compromise the integrity of the analysis...

Finally, even if this Court were to find that the ALJ's decision contains an error, Plaintiff, as the moving party, has the burden of proving that making the error changed the ALJ's decision...In this case, Plaintiff has not explained how she was harmed by the ALJ's failure to indicate whether or not fibromyalgia was severe.

(Def.'s Br. at 10-12.)

The five-step sequential evaluation process governs the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). The second inquiry in that evaluation process is whether the claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c) (2006). A severe impairment is one "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2006); 20 C.F.R. § 416.920(c) (2006); see also 20 C.F.R. § 404.1521(a) (2006); 20 C.F.R. § 416.921(a) (2006). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b)(2006); 20 C.F.R. § 416.921(b) (2006). Examples of basic work activities are:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and

43

(6) Dealing with changes in a routine
work setting.

Id.

Claimant takes issue with the ALJ's failure to find that her
fibromyalgia is a severe impairment. (Pl.'s Br. at 4-8.) However,
it appears to the court that the ALJ properly evaluated Claimant's
fibromyalgia under the applicable regulations and Fourth Circuit
law. See 20 C.F.R. §§ 404.1520, 416.920 (2006); Stup v. UNUM Life
Ins. Co., 390 F.3d 301, 303 (4th Cir. 2004).

The court in Stup v. UNUM Life Insurance Company, 390 F.3d 301
(4th Cir. 2004), discussed fibromyalgia as follows:

> Fibromyalgia is a rheumatic disease with . . . symptoms
> including "significant pain and fatigue," tenderness,
> stiffness of joints, and disturbed sleep. Nat'l
> Institutes of Health, Questions & Answers About
> Fibromyalgia 1 (rev. June 2004),
> http://www.niams.nih.gov/hi/topics/fibromyalgia/Fibromy
> algia.pdf. See also Ellis v. Metro Life Ins. Co., 126
> F.3d 228, 231 n.1 (4th Cir. 1997) (quoting Taber's
> Cyclopedic Medical Dictionary (16th ed. 1989)); Sarchet
> v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996). Doctors
> diagnose fibromyalgia based on tenderness of at least
> eleven of eighteen standard trigger points on the body.
> Sarchet, 78 F.3d at 306. "People with rheumatoid
> arthritis and other autoimmune diseases, such as lupus,
> are particularly likely to develop fibromyalgia." Nat'l
> Institutes of Health, supra, at 4. Fibromyalgia "can
> interfere with a person's ability to carry on daily
> activities." Id. at 1. "Some people may have such a
> severe case of fibromyalgia as to be totally disabled
> from working, but most do not." Sarchet, 78 F.3d at 307
> (citations omitted).

Stup, 390 F.3d at 303.

In discussing Claimant's residual functional capacity, the ALJ
considered Dr. Ramesh's diagnosis of fibromyalgia in November 2006

44

and Claimant's testimony that she has fibromyalgia. (Tr. at 24.)
The ALJ also considered the June 19, 2006 opinion of Dr. Pascasio
and the December 8, 2006 opinion of Dr. Gomez, State agency medical
sources, who diagnosed fibromyalgia and concluded that Claimant
could perform light work. (Tr. at 26.) Further, the ALJ concluded
that Claimant's severe impairments included major depressive
disorder with anxiety and pain disorders.  (Tr. at 18-19, 26.)
Accordingly, the undersigned finds that substantial evidence
supports the ALJ's finding that Claimant suffered severe impairment
from "pain" disorders and did not err in not specifically grading
the severity of Claimant's fibromyalgia condition. (Tr. at 18.)
The ALJ's comprehensive residual functional capacity finding
accommodated any limitations arising from fibromyalgia symptoms.

<u>Vocational Expert</u>

Claimant argues that the ALJ failed to "appropriately evaluate
the vocational expert's opinions or, in the very least, wrongfully
and arbitrarily dismissed certain conclusions reached by the
vocational expert...the Plaintiff's evidence when viewed
appropriately as credible - clearly supports that she cannot
perform the vocational aspects required of the jobs identified by
the VE." (Pl.'s Br. at 10-11.)

The Commissioner responds that the ALJ met his burden at step
five to produce evidence of work that Plaintiff could have
performed during the relevant period despite her impairments: "In

45

essence, because the ALJ's hypothetical question fairly set forth all of Plaintiff's limitations, the ALJ was entitled to rely upon the VE's responsive testimony that Plaintiff could perform some unskilled, light work and, thus, was not disabled within the meaning of the Act."  (Def.'s Br. at 18-19.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989).  "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity."  Id. at 51.  Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe.  Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

The ALJ considered the evidence of record and the testimony of the vocational expert.  He found:

> If the claimant had the residual functional capacity to
> perform the full range of light work, a finding of "not

disabled" would be directed by Medical-Vocational Rule
202.21.  However, the claimant's ability to perform all
or substantially all of the requirements of this level of
work has been impeded by additional limitations.  To
determine the extent to which these limitations erode the
unskilled light occupational base, the Administrative Law
Judge asked the vocational expert whether jobs exist in
the national economy for an individual with the
claimant's age, education, work experience, and residual
functional capacity.  The vocational expert testified
that given all of these factors the individual would be
able to perform the requirements of representative
occupations in the national/regional...economy such as
light level office helper...production inspector...and
mail clerk (non-postal)...The vocational expert also
provided jobs at the sedentary level as surveillance
systems monitor...fabrication machine tender...and bench
worker.

(Tr. at 27-28.)

   With respect to Claimant's argument that the ALJ failed to

"appropriately evaluate the vocational expert's opinions" is

without merit.  The ALJ's residual functional capacity finding

related to Claimant's impairments reflected Claimant's limitations

as supported by substantial evidence of record.  These limitations

were included in several increasingly restrictive hypothetical

questions, and the vocational expert concluded that Claimant could

perform work.  (Tr. at 995-1000.)  Claimant's representative had

an opportunity to pose additional hypothetical questions to the

vocational expert, and did so.  (Tr. at 1001-002.)  The record

clearly shows that the ALJ was present and attentive during the re-

examination of the vocational expert.  (Tr. at 1000-002.)

   After a careful consideration of the evidence of record, the

court finds that the Commissioner's decision is supported by

substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED**, the plaintiff's motion for judgment on the pleadings is denied, and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: March 3, 2011

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge